Jeffrey F. RYAN, Plaintiff-Appellant,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant-Appellee.

No. 84–7138.

United States Court of Appeals, Eleventh Circuit.

June 11, 1985.

William A. Barnett, Florence, Ala., for plaintiff-appellant.

Frank W. Donaldson, U.S. Atty., Mary P. Thornton, Mark Tippins, Asst. U.S. Attys., Birmingham, Ala., for defendant-appellee.

Before GODBOLD, Chief Judge, ANDERSON, Circuit Judge, and THORNBERRY *, Senior Circuit Judge.

GODBOLD, Chief Judge:

The Secretary denied child insurance benefits and SSI benefits to a 25 year-old man who is brain damaged and suffers from

* Honorable Homer Thornberry, U.S. Circuit Judge for the Fifth Circuit, sitting by designa- tion.

seizures and emotional problems. The district court found substantial evidence to support the Secretary's decision. Because the Secretary failed to follow her own regulations, we vacate and remand for further consideration under proper legal standards.

## FACTS

Appellant Jeffrey Ryan was seriously hurt in an automobile accident in 1972, suffering severe injury to his brain and skull. Subsequently he began to experience seizures and to suffer from emotional difficulties. He has been, and is being, treated for his problems and takes medication for his seizures. Appellant has never been employed and has the equivalent of a high school education. He currently lives with his mother and a younger sister; his father is deceased.

The ALJ's detailed and comprehensive summary of the medical evidence shows the following. In 1972 Ryan underwent extensive surgery to repair severe injury to his skull and brain caused by an automobile accident. Appellant's treating physician, Dr. Nofzinger, reported that his post-operative recovery was relatively uneventful, although protracted and marked by appellant's "extreme fear-type of reactions."

In 1973 it was felt that Ryan would benefit from academic tutoring and that he might need counseling in connection with a possible behavioral problem caused by his prolonged illness.

In 1974 appellant was evaluated by a psychologist, Dr. Miller, at the request of Dr. Nofzinger. Dr. Miller found that Ryan was moderately to severely depressed and also suffered from a moderate to severe adolescent reaction. The doctor concluded that the source of his emotional problems was not organic but resulted from his home environment.

Appellant's seizures increased in 1975, and Dr. Nofzinger increased his daily Dilantin dosage to 300 milligrams. Appellant was hospitalized in August, 1976, for evaluation after emergency referral by the Mental Health Center. He was found to be suffering from grand mal seizures and a probable anti-social personality disorder. Dr. Nofzinger also noted that he thought that Ryan was homicidal and needed to see a psychiatrist.

In 1977 Dr. Wicks, a psychiatrist, interviewed and evaluated appellant at the request of the Alabama Disability Determination Unit. Dr. Wicks found Ryan to be a rather ordinary young man who did not suffer from any psychiatric disorder and who was competent to manage his own affairs.

In 1978 Dr. Nofzinger reported that appellant's neurological condition was stable but that his psychological status had deteriorated sharply. His emotional condition and personality problems were far beyond the control of physicians. County authorities agreed that Ryan needed to be committed for his own safety. Dr. Nofzinger also noted that he believed that Ryan was not taking his medication regularly and also that it was difficult to determine the exact cause and source of his emotional problems.

During this same period Ryan was examined once by another neurologist, Dr. Pearson. She noted deformities in his hand, foot, skull, and face caused by the automobile accident. She reported that he was suffering grand mal seizures every month or less. She also suggested that he could manage his financial affairs.

Records from University Hospital in Birmingham, Alabama, revealed that claimant was admitted to the psychiatric unit in March, 1979. Psychological testing indicated immaturity and impulsiveness but no other abnormalities. His diagnoses at discharge were developmental delay, major motor seizures and temporal lobe seizures, and non-psychotic organic brain syndrome with brain trauma. He was subsequently enrolled in the Day Treatment Center and received counseling until 1980 when counselors reported that, while he had made progress, they were uncertain whether he could function in an unstructured environment.

Dr. Halsey reported in November, 1981, that Ryan had been examined on two occasions. Appellant had significant brain damage and a seizure disorder that was currently under adequate control. He averaged a few to several seizures per month despite sizable doses of Dilantin and Tegrotol. In addition, Dr. Halsey suggested that Ryan was apparently mentally retarded and essentially incapable of fully caring for himself or managing financial benefits in his own best interest. Dr. Halsey recommended that if there was any question about his disability status based on his seizure disorder alone, quantitative psychometric tests should be done to document his degree of mental incapacity.

Appellant subsequently underwent consultative psychological evaluation on January 7, 1982, by clinical psychologist, Dr. Saxon. He noted that appellant had a rather awkward gait and appeared rather flat in affect throughout most of the session but was able to show some humorous responses to comments. He obtained a verbal IQ of 96, a performance IQ of 85, and a full scale IQ of 90, placing his level of intellectual functioning in the low end of the average range. Dr. Saxon stated that the evidence suggested that a rather concerted effort to reeducate had been made, given the severity of appellant's injury and especially since he had a frontal lobe injury in which brain tissue had to be removed. The examiner concluded that given the nature of his apparent injury, appellant would not appear to be particularly employable unless great pain were taken to put him in an appropriate job placement.

Claimant also underwent consultative neurological evaluation in January 1982. Dr. Schottland reported his impression as generalized post traumatic seizure disorder of moderate severity which with difficulty was controlled on medication, some bilateral motor abnormalities, particularly on the right side, and a mild aphasiac speech disturbance which he estimated probably constituted a 60 percent total body impairment.

In a brief, conclusory report dated March 9, 1982, submitted by appellant at the hearing, Dr. Wilson certified that he had seen Ryan just after his automobile accident. He had a compound fracture of the skull with some brain tissue missing. Dr. Wilson concluded that the loss of the brain tissue caused a severe personality change rendering appellant unable to care for himself. Dr. Wilson also stated that Ryan was unemployable.

At the hearing appellant testified that he suffered from severe headaches, dizziness, depression, leg and foot pain, and occasional and irregular seizures. He claimed that the seizures occurred without warning and caused him to lose consciousness. He experienced no bladder or bowel incontinence during those attacks. Seizures left him exhausted and unable to talk. Appellant stated that he did take his medication as prescribed. He testified that he saw his treating physician Dr. Halsey every five or six months and has had his medication levels adjusted. According to Ryan, Dr. Halsey told him that medication could not completely eliminate the seizures. Ryan further testified that although restricted somewhat by his pain and physical problems, he did help out around the house. Shirley Burnette, appellant's mother, also testified. She essentially corroborated her son's testimony.

Based upon this record the ALJ concluded that "[i]t is obvious, and the Administrative Law Judge certainly recognizes the fact that claimant has some medical problems. However, he does not believe that taken as a whole, the record shows claimant to be incapable of all work activity." 2 Rec. at 17. The ALJ denied Ryan's application for benefits.

## DISCUSSION

Our review is limited to determining whether there is substantial evidence in the record as a whole to support the Secretary's findings. *See, e.g., Owens v. Heckler*, 748 F.2d 1511 (11th Cir.1984). We cannot, however, conduct a review that is both limited and meaningful if the ALJ does not state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered. *See id.;*

see also Hudson v. Heckler, 755 F.2d 781 (11th Cir.1985). A limited and meaningful review is not possible in this case.

For example, the ALJ states that appellant "apparently has the ability to utilize common sense in a job setting, and there is no evidence to show that he could not respond appropriately to supervisors, co-workers, and ordinary work pressures; or that he could not behave independently without constant supervision." 2 Rec. at 17. The ALJ's own summary of the evidence, however, indicates that whether appellant can work in an unstructured work environment is a highly disputed point. The record shows that Drs. Nofzinger and Saxon, as well as counselors at the Day Treatment Center, found that Ryan could not function in a normal work situation. On the other hand, Drs. Wicks and Pearson concluded that appellant was competent to manage his own affairs. The ALJ does not explain how he concluded that Ryan could function adequately, and in particular, why he seems to discount, or reject, the evidence presented by Drs. Nofzinger and Saxon (and the counselors). This lack of explanation is particularly troublesome since one of the doctors whose observations were apparently rejected (Dr. Nofzinger) is appellant's long-time treating physician. Cf. Warncke v. Harris, 619 F.2d 412 (5th Cir.1980) (opinion of treating physician is generally entitled to more weight than that of non-treating physician).

The ALJ also seems to reject most of the testimony of appellant and his mother on credibility grounds.[1] Credibility determinations are, of course, for the Secretary, not the courts. See Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir.1983). Nevertheless, if the ALJ does reject a claimant's testimony, he must explicitly so state. See Owens v. Heckler, supra. The only apparent reason given by the ALJ for his discounting of appellant's testimony is in reference to the severity of Ryan's pain: "In regard to his complaints of frequent severe headaches, the only medication tak-

en for his headaches is aspirin." 2 Rec. at 17. This implicit credibility determination as to appellant's testimony relating to pain does not satisfy the ALJ's responsibility to explicitly state why other testimony offered at the hearing was rejected.

The ALJ has simply not indicated what legal standards were applied or what weight was accorded the evidence considered. His statement that he "has carefully considered all the testimony at the hearing, the arguments made, and the documents described in the List of Exhibits" is not enough. See Cowart v. Schweiker, 662 F.2d 731 (11th Cir.1981). Because we are unable to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence, we vacate and remand for further consideration.

VACATED and REMANDED with instructions to remand to the Secretary.

---

1. For example, while expressly accepting appellant's testimony that he has sometimes gone five weeks without suffering a seizure, the ALJ ignores appellant's testimony that he also sometimes has two or three seizures a week.